

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1787 | **DATE** | 3/21/2002 |
| **CASE TITLE** | Pamela Tucker vs. Loyola University of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [11-1] is granted. Judgment is entered in favor of the defendant and against the plaintiff. This case is hereby dismissed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | **MAR 2 2 2002** date docketed | 23 |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RO | courtroom deputy's initials | 02 MAR 21 PM 4:54 Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PAMELA TUCKER, | ) |
| Plaintiff, | ) |
| | ) No. 01 C 1787 |
| v. | ) |
| | ) Judge Ruben Castillo |
| LOYOLA UNIVERSITY OF CHICAGO, | ) |
| Defendant. | ) |

DOCKETED
MAR 2 2 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff Pamela Tucker sues Defendant Loyola University of Chicago ("Loyola") for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*[1] Ms. Tucker alleges that Loyola discriminated against her in connection with her separation from employment as the Director of Administrative Services at Loyola. Currently before the Court is Loyola's motion for summary judgment. Because Ms. Tucker cannot establish a *prima facie* case of race discrimination or demonstrate that Loyola's reason for taking adverse employment action against her was pretextual, Loyola's motion for summary judgment is granted. (R. 11-1.)

## RELEVANT FACTS[2]

On April 20, 1998, Ms. Tucker began working as the Director of Administrative Services in the Assistant Treasurer's Office at Loyola. Ms. Tucker is African-American and was forty-nine years old when she was hired by Loyola. Cynthia Redman, Loyola's Vice President for

---

[1] Ms. Tucker also asserted a claim of age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.* (R. 1-1, Compl. ¶ 1.) Ms. Tucker, however, chose not to address this claim in her memorandum in opposition to Loyola's motion for summary judgment. (*See* R. 17.) Because Ms. Tucker has not established a *prima facie* case of age discrimination, the Court considers this claim waived.

[2] These facts are derived from the parties' statements of fact filed pursuant to Local Rule 56.1. Unless otherwise indicated, the facts included herein are undisputed.

Finance and the Assistant Treasurer, hired Ms. Tucker and was her immediate supervisor when Ms. Tucker was employed by Loyola. Ms. Redman is Caucasian. Ms. Tucker was employed as Loyola's Director of Administrative Services from April 20, 1998 through November 3, 2000.

According to Loyola, Ms. Tucker's job duties when she was hired included overseeing Loyola's mail rooms, printing services, central stores, purchasing and bookstores. (R. 11, Def.'s Facts ¶ 27.) Ms. Tucker disputes that she was responsible for overseeing the bookstore and states that, during her employment at Loyola, her duties also included maintenance of the departmental website and copier contracts. (R. 18, Pl.'s Add'l Facts ¶ 2.) Ms. Tucker received her first performance evaluation in March 1999. In this evaluation, Ms. Redman described Ms. Tucker's work performance as "very good" and assigned her a score of four and a half out of five.

According to Loyola, Ms. Tucker's work performance and the quality of her work product began to decline in the summer of 1999. Ms. Tucker's work performance problems included missing deadlines, incomplete work and not following up on projects as assigned. (R. 11, Def.'s Facts ¶¶ 29-30.) Furthermore, Ms. Tucker "exhibited a bad attitude and did not exhibit a positive customer services approach to addressing issues and problems with people at [Loyola]." (Id. at ¶ 32.) Ms. Redman verbally warned Ms. Tucker about her work performance deficiencies. (Id. at ¶ 31.) Ms. Tucker denies that her work performance declined, that she exhibited a bad attitude or that she was warned by Ms. Redman regarding performance problems. (R. 19, Pl.'s Resp. to Def.'s Facts ¶¶ 29-32.)

In the fall of 1999, Ms. Redman began having weekly meetings with Ms. Tucker to discuss new tasks as well as tasks outstanding from prior meetings. Ms. Redman initially saw improvement in Ms. Tucker's work performance. She stated, however, that the improvement

2

ceased after a couple of months, at which time – notwithstanding the weekly meetings – Ms. Redman noticed an increase in incomplete assignments, poor work quality and missed deadlines. Ms. Redman noted that the heads of the departments for whom Ms. Tucker worked complained to her about Ms. Tucker not returning calls and e-mails and exhibiting poor work performance and attitude. Ms. Tucker expressed concern regarding her workload to Ms. Redman and stressed that she felt she had too much work to do. (*Id.* at ¶ 44.)

In early 2000, Ms. Redman assumed Ms. Tucker's responsibilities for the mail rooms because she felt that Ms. Tucker was unable to complete the work that needed to be done in this area. Additionally, Ms. Redman assumed Ms. Tucker's duties regarding printing services, and Ms. Redman reduced Ms. Tucker's bookstore duties.[3] Despite the decline in responsibilities, Ms. Tucker's salary was never reduced. (R. 11, Def.'s Facts ¶ 88; R. 19, Pl.'s Resp. to Def.'s Facts ¶ 88.) Rather, Ms. Redman recommended that Ms. Tucker receive a raise in her salary in both 1999 and 2000.

In her 2000 performance evaluation, Ms. Redman rated Ms. Tucker's performance as a three out of five or "on target." Ms. Redman emphasized that she felt that there was a substantial decline in Ms. Tucker's work performance from the previous year. During this time, Ms. Redman never recommended that Ms. Tucker be terminated, nor did Ms. Redman ever take disciplinary action against Ms. Tucker for poor work performance. On several occasions, Ms. Tucker informed Ms. Redman that she was looking for another job because she wished to move

---

[3] As noted above, Ms. Tucker denies that the bookstore was one of her job responsibilities. She admits, however, that Ms. Redman assumed responsibility for the bookstores. (R. 18, Pl.'s Add'l Facts ¶¶ 53-54.) Ms. Tucker also admits that Ms. Redman assumed her job duties regarding Loyola's printing services area. (*Id.* at ¶ 55.)

to Florida. (R. 11, Def.'s Facts ¶ 63; R. 19, Pl.'s Resp. to Def.'s Facts ¶ 63.) Ms. Redman cites these expressions of intent by Ms. Tucker as the reason she never recommended disciplinary action or termination.

Prior to the creation of the Director of Administrative Services position for which Ms. Tucker was hired, there was a Purchasing Manager position at Loyola. The Director of Administrative Services position was created to encompass the duties of the Purchasing Manager as well as a number of other functions. Because Ms. Tucker was not performing all of the functions of the Director of Administrative Services position, Ms. Redman and Janet Gibbs, the Senior Vice President for Finance, decided to revive the Purchasing Manager position and to offer it to Ms. Tucker. In October 2000, Ms. Redman presented Ms. Tucker with three options regarding her employment at Loyola. One option was to remain in the revised and re-graded position of Purchasing Manager with a nine percent reduction in salary. The second option was to remain in her position as Director of Administrative Services at her current salary for three months, at which time her employment would be terminated. The third option was that Ms. Tucker could leave her position by November 10, 2001, and receive severance pay equivalent to eight weeks of her salary. Ms. Tucker chose to accept the third option, and notified Loyola's Director of Human Services that her resignation would be effective on November 1, 2000. (R. 11, Def.'s Facts ¶ 87; R. 19, Pl.'s Resp. to Def.'s Facts ¶ 87.)

Ms. Tucker contends that Ms. Redman informed her that Ms. Gibbs had hand-picked Ms. Tucker's successor prior to Ms. Tucker leaving Loyola. (R. 18, Pl.'s Add'l Facts ¶ 7.) Loyola, however, disputes this contention, (R. 20, Def.'s Reply to Pl.'s Add'l Facts ¶ 7), and maintains that Ms. Gibbs selected Ms. Tucker's successor after Ms. Tucker resigned. (R. 11,

4

Def.'s Facts ¶ 91). Ms. Tucker's successor, Tim McGuirman – a Caucasian and a current employee at Loyola – was selected by internal promotion to serve as the Director of Administrative Services.

On March 14, 2001, Ms. Tucker filed a complaint against Loyola asserting claims of race discrimination in violation of Title VII of the Civil Rights Act of 1964 and age discrimination in violation of the Age Discrimination in Employment Act. Presently before the Court is Loyola's motion for summary judgment, filed on October 11, 2001. After carefully reviewing the facts of this case, we grant Loyola's motion.

## LEGAL STANDARD

Summary judgment is proper only when the record shows there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence in a light most favorable to the nonmoving party and draw all inferences in the nonmovant's favor. *Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 540 (7th Cir. 1998). The Court, however, need not defeat a motion for summary judgment due to "the mere existence of some alleged factual dispute between the parties," *Liberty Lobby*, 477 U.S. at 247, or the existence of "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Moreover, in considering a motion for summary judgment, we need not assume the truth of a nonmovant's conclusory allegations on faith or scour the record to unearth factual disputes. *Carter v. Am. Oil Co.*, 139 F.3d 1158, 1163 (7th Cir. 1998). Ultimately, this Court must decide "whether the state

of evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1573 (7th Cir. 1989). Weighing evidence and making credibility decisions are jury functions, however, not those of the judge deciding a motion for summary judgment. *See Liberty Lobby*, 477 U.S. at 255. These pronouncements apply with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *See, e.g., Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993). Mindful of these legal standards, we now proceed to our examination of Ms. Tucker's Title VII race discrimination claim.

## ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against their employees on the basis of race. 42 U.S.C. § 2000(e)-2(a)(1). Under Title VII, Ms. Tucker bears the ultimate burden of proving that her employment was adversely affected by her race. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1169-70 (7th Cir. 1997). A plaintiff may prove discrimination under Title VII either through direct evidence of discrimination or indirectly, through the burden-shifting approach of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Because Ms. Tucker concedes that she has no direct evidence of discrimination, we will analyze her claim using the burden-shifting approach. In order to establish a *prima facie* case of race discrimination, Ms. Tucker must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was meeting her employer's legitimate performance expectations; and (4) her employer treated similarly-situated employees who were not in the protected class more favorably. *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 752 (7th

6

Cir. 2000).

Under the *McDonnell Douglas* framework, once a *prima facie* case is established, a rebuttable presumption of employment discrimination is created and the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1994). If the employer satisfies that burden, the plaintiff must show that the articulated reasons were pretextual. *Id.* We note, however, that the burden of persuasion remains with the plaintiff at all times. *Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000). Because Ms. Tucker cannot satisfy the third or fourth prongs of her *prima facie* case[4] or demonstrate that Loyola's articulated reasons for the adverse employment action were a pretext for discrimination, we grant Loyola's motion for summary judgment.

## I. Ms. Tucker Was Not Meeting Loyola's Legitimate Employment Expectations

Loyola asserts that Ms. Tucker was not performing her required job duties to the legitimate expectations of her superiors at the time of the revision of her job duties. Loyola

---

[4] Loyola argues that Ms. Tucker cannot fulfill the second prong of her *prima facie* case – that Loyola took adverse employment action against her – because Ms. Tucker ultimately resigned her employment. We agree with Ms. Tucker that this argument is without merit. An adverse employment action is "a materially adverse change in the terms and condition of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). Adverse employment action encompasses more than termination or a decrease in salary, and may also include actions such as bestowing on an employee "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 136. Based upon this definition, the three options Loyola offered to Ms. Tucker regarding her continued employment at Loyola clearly constitute adverse employment action, despite the fact that Ms. Tucker ultimately chose to resign.

contends that Ms. Tucker has produced no evidence other than her own general allegations of adequate performance, which Defendant correctly observes do not create a triable issue of fact to defeat summary judgment. *See Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 865 (7th Cir. 1996) (citation omitted).

In response, Ms. Tucker points the Court to her performance evaluations as evidence of adequate work performance. In Ms. Tucker's March 1999 evaluation, Ms. Redman graded Ms. Tucker at a level of four and a half out of five, which meant that she was "exceeding her target." Approximately one year later, Ms. Tucker received a grade of three out of five on her second performance review, which meant that her job performance was "on target." Seven months later, in October 2000, Loyola presented Ms. Tucker with three options regarding her continued employment at Loyola, and Ms. Tucker chose to resign.

The critical issue in this case is whether Ms. Tucker was performing well at the time of her termination." *See Hong*, 993 F.2d at 1262 (citation omitted); *Fortier v. Ameritech Mobile Communications, Inc.* 161 F.3d 1106, 1113 (7th Cir. 1998) (stating that "earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken"). Here, Ms. Tucker simply has not presented any evidence that she was meeting Loyola's legitimate employment expectations at the time of her termination. Rather, Ms. Tucker relies on a positive performance evaluation completed one year and seven months prior to her separation from employment at Loyola, as well as another performance review completed approximately seven months prior to her separation that exhibited a clear decline in her performance from the previous year. While this evidence may demonstrate that Ms. Tucker previously met Loyola's employment expectations, it does not satisfy the burden of

8

persuasion – unfortunately for Ms. Tucker – that she was meeting Loyola's employment expectations at the relevant time of her separation from employment.[5]

Furthermore, Loyola has produced considerable evidence which demonstrates that Ms. Tucker was not performing up to its legitimate expectations. For example, in the fall 1999, after Ms. Tucker had been employed by Loyola for approximately six months, Ms. Redman began to have weekly meetings with Ms. Tucker to discuss outstanding issues and new initiatives. (R. 11, Def.'s Facts ¶¶ 33-34; R. 19, Pl.'s Resp. to Def.'s Facts ¶¶ 33-34; R. 21, Def.'s Supplemental Ex. No. 12 at 1.) Additionally, Ms. Tucker admits that on many occasions she complained to Ms. Redman about her workload. Specifically, she complained that she had too much work to do. (R. 11, Def.'s Facts ¶¶ 44-45; R. 19, Pl.'s Resp. to Def.'s ¶¶ 44-45.) Furthermore, in early 2000, Ms. Redman assumed Ms. Tucker's responsibility over the mail rooms and printing services – areas which were in Ms. Tucker's job description and over which she had responsibility for approximately the first nine months of her tenure at Loyola. None of these examples is consistent with Ms. Tucker's assertion that she was meeting Loyola's legitimate employment

---

[5] Ms. Tucker argues that her case is similar to *Johnson v. Zema Systems Corp.*, 170 F.3d 734 (7th Cir. 1999). In *Zema Systems*, the plaintiff produced consistently positive employment evaluations as well as a recommendation from the president of the company which showed that he was meeting his employer's legitimate performance expectations at the time of his termination. *Id.* at 737-38. The *Zema* Court stated that "[a]lthough Johnson's positive employment evaluations might be insufficient if they evidenced a pattern of declining performance, here no such pattern appears. We find it significant that at the point of termination, Zema continued to assert that Johnson was meeting, in fact exceeding, its expectations." *Id.* at 743 (citations omitted). Ms. Tucker, however, does not offer similar evidence. Rather, she points to one positive evaluation and another evincing declining performance and, more importantly, she has produced no evidence like the recommendation letter provided to the *Zema* plaintiff at the time of his termination to demonstrate that she too was meeting her employer's legitimate expectations when the alleged discrimination occurred (*i.e.* at the time of her separation from employment at Loyola).

9

expectations. For these reasons, Ms. Tucker has not established the third element of her *prima facie* case of race discrimination.

**II. Similarly-Situated Employees Were Not Treated More Favorably**

Even if Ms. Tucker could establish that she was meeting Loyola's legitimate employment expectations, she has not presented evidence that similarly-situated workers outside of her protected class received more favorable treatment. Ms. Tucker states that Susan Yanek, a Caucasian who was the Manager of Design Services, was given certain temporary assignments and did not receive a salary reduction when the assignments were taken away from her. In contrast, Ms. Tucker claims that she had areas of responsibility taken away from her and that her salary was going to be reduced. Therefore, according to Ms. Tucker, she has met her burden of demonstrating that similarly-situated Caucasian employees were treated more favorably. We disagree. First, Ms. Tucker has not demonstrated that Ms. Yanek is, in fact, similarly-situated to Ms. Tucker such that a comparison of the two is appropriate. While Ms. Tucker correctly points out that the simple fact that she was the only Director of Administrative Services does not preclude a comparison of Loyola's treatment of her with that of other non-minority employees, *see Zema Sys.*, 170 F.3d at 743, Ms. Tucker ignores the principle that comparison is only appropriate where two employees are similarly-situated with respect to things such as performance, qualifications and conduct. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).

Moreover, Ms. Tucker has neither presented any evidence regarding Ms. Yanek's duties, performance history or qualifications, nor has Ms. Tucker provided any information regarding the circumstances surrounding Ms. Yanek's alleged salary level retention following the removal

10

of certain temporary assignments. The only information that the Court is able to glean regarding Ms. Yanek's employment situation is that Ms. Tucker was her supervisor, and that she was temporarily given increased duties along with an increase in pay, which she retained beyond the cessation of the increase in her duties. The fact that Ms. Yanek was Ms. Tucker's subordinate – and thus not at a similar employment level – compels the Court to conclude that these two women were not similarly-situated so as to be ripe for comparison.[6] Furthermore, Ms. Yanek only had additional temporary duties taken away from her. In contrast, the duties taken away from Ms. Tucker were the permanent duties of her Director of Administrative Services position which, according to her employer, were duties that Ms. Tucker was expected to perform but was not performing in an adequate manner. Therefore, because Ms. Tucker has not shown that similarly-situated employees outside of her protected class received more favorable treatment, she has not established the fourth element of her *prima facie* case of race discrimination.

### III. Pretext

Finally, even assuming that Ms. Tucker could establish a *prima facie* case of race discrimination, summary judgment would nonetheless be warranted in this case because Ms. Tucker has not demonstrated that Loyola's proffered nondiscriminatory reasons for the adverse employment action were a pretext for discrimination. A plaintiff can establish pretext by

---

[6] Ms. Tucker again cites *Zema Systems* for the proposition that, although she was the only Director of Administrative Services at Loyola, this does not preclude her from comparing herself to a Caucasian employee at a similar level. *See Zema Sys.*, 170 F.3d at 743-44. The *Zema* Court determined that while the plaintiff was the vice president of sales and marketing, he could still be compared to the company's vice president and general manager because this was "the only person besides [plaintiff] to occupy an intermediate managerial position." *Id.* at 744. Ms. Tucker and Ms. Yanek, on the other hand, do not occupy comparable employment levels because Ms. Tucker was Ms. Yanek's supervisor.

showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (citing *Sarsha*, 3 F.3d at 1039). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). An honest belief in the nondiscriminatory reasons offered by the decision-maker will be sufficient "even if the reasons are foolish, or trivial or even baseless." *Debs*, 153 F.3d at 396.

In the instant case, Loyola has offered a legitimate, nondiscriminatory reason for the adverse employment action. Specifically, Loyola contends that Ms. Tucker was not performing the job duties that she was hired to perform in a timely, efficient or competent manner. In response, Ms. Tucker urges that if the Court looks at the totality of the facts, we "could easily conclude that Loyola was less than forthcoming about the real reasons it chose to do what it did to [her]." (R. 17, Pl.'s Mem. in Opp'n at 6.) Ms. Tucker cites as evidence of pretext Loyola's lack of written warnings of any imminent action against her, the fact that her last two performance reviews were positive and that Ms. Redman allegedly told Ms. Tucker that Ms. Gibbs had hand-picked Ms. Tucker's replacement before giving her any options regarding her continued employment at Loyola.[7] We disagree. The Court assures Ms. Tucker that we have

---

[7] Although Loyola disputes that Ms. Redman told Ms. Tucker that her replacement had been hand-picked by Ms. Gibbs prior to Loyola offering Ms. Tucker any options regarding her continued employment at Loyola, (Def.'s Reply to Pl.'s Add'l Facts ¶ 7), this is not a material dispute sufficient to defeat summary judgment. Assuming *arguendo* that Ms. Gibbs had determined Ms. Tucker's successor prior to informing Ms. Tucker of her options for continued employment at Loyola, this fact has no relevance to Loyola's legitimate belief that Ms. Tucker was not adequately fulfilling her job responsibilities as the Director of Administrative Services.

carefully examined the totality of the facts in this case and we simply cannot conclude that Loyola's proffered reason for its action against Ms. Tucker is a lie or is unworthy of credence.

First, the lack of any written warnings by Loyola to Ms. Tucker regarding the prospect of imminent adverse employment action against her does not equate to Loyola being satisfied with Ms. Tucker's work performance. The record establishes that Ms. Redman began to have weekly meetings with Ms. Tucker to discuss uncompleted and new tasks, and that Ms. Redman took over various employment responsibilities of Ms. Tucker because Loyola believed that they were not being handled in a satisfactory or efficient manner. These undisputed facts demonstrate that Ms. Tucker was not performing up to Loyola's legitimate expectations. The fact that Loyola did not issue a memo to Ms. Tucker detailing her job performance inadequacies or stating that Loyola was considering adverse employment action does not establish that Loyola was using Ms. Tucker's performance deficiencies as a proxy for impermissible race discrimination. To the contrary, Loyola's efforts appear to be its attempt to mitigate the potential damage of Ms. Tucker's inadequate job performance so that adverse employment action against Ms. Tucker ultimately would not become necessary. Perhaps Loyola could have been more forthcoming with Ms. Tucker regarding her job performance or its intent vis-à-vis her continued employment with Loyola. The Court, however, is not entitled to second-guess Loyola's business decisions. *See Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 787 (7th Cir. 2001).

Additionally, Ms. Tucker's "positive" performance evaluations do not demonstrate that Loyola's articulated reasons for its adverse employment action were a pretext for discrimination. Even though the second evaluation indicated that Ms. Tucker was "on target," her 2000 evaluation clearly evinces declining performance from the previous year. Also, the most recent

13

evaluation was completed approximately seven months before Loyola took any adverse action against Ms. Tucker. Had both evaluations been truly positive – exhibiting consistent, above-average performance rather than inconsistent, mediocre performance – and had there not been such a considerable lapse of time between the last evaluation and the adverse employment action, then a material question of fact may have arisen on the issue of pretext. That is not, however, the case before us. Ms. Tucker has failed to offer sufficient evidence to fulfill her burden of demonstrating that Loyola's articulated, nondiscriminatory reasons for its adverse employment action against her was an impermissible pretext for discrimination. Therefore, we must grant Loyola's motion for summary judgment because the undisputed facts would not allow a reasonable jury to return a verdict in favor of Ms. Tucker.

## CONCLUSION

It is truly unfortunate that Loyola could not have enjoyed a more constructive employment relationship with Ms. Tucker. Despite the Court's sympathy for Ms. Tucker's plight, however, the record does not allow us to conclude that she has established any material disputes that require a resolution at trial. For these reasons, we grant Defendant's motion for summary judgment. (R. 11-1.) The Clerk of the Court is instructed to enter final judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of Defendant and against Plaintiff.

ENTERED:

Judge Ruben Castillo
United States District Court

Dated: March 21, 2002